UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| -v.- | : | 07-CR-00673 (VM) |
| SAM NING SON CHIANG | : | <u>Sentence Memorandum</u> |
| | : | |
| Defendant. | : | |
| | : | |

--------------------------------------------------------x

      We respectfully submit this sentence memorandum on behalf of the defendant Sam Ning Son Chiang who was to be sentenced on November 30, 2007. The date and time of defendant's sentence was changed to December 21, 2007, at 3:15 p.m., when a question arose as to the authenticity of defendant's naturalization papers. We have just received word from the Probation Department that defendant was, in fact, duly naturalized in the Eastern District Court on June 26, 1979. Thus, defendant's naturalization has been properly established, and we are now ready to proceed to sentence.

      Defendant Chiang, who is 60 years of age, entered a guilty plea to Count 1 of an information on July 24, 2007, which charged him with Conspiracy to Commit a Sham Marriage with an alien [8 USC 1325(c)] for the purpose of evading provisions of the immigration laws. He is claimed to have falsely submitted papers to the State Department claiming that he had previously 'lived with' his new wife, (Xu, Sai Jin). As a part of this arrangement, defendant received two payments of $5000.00 (each) and traveled to China twice where he entered into a marriage in January, 2004 with the Chinese national (Xu, Sai Jin). He consummated that

marriage and spent several weeks in China with his new wife; returning later for a second visit. The newlyweds stayed together initially in the wife's home. Defendant met Xu's two teen aged sons and part of the agreement between defendant and Ms. Xu was to seek admission of the two children (aged 16 and 14 years) into the United States.

When defendant returned to the United States after the marriage ceremony in China, he started the paperwork and filed the necessary applications with the Department of State. Defendant yearned for children of his own and the prospect of adopting two sons and living with a woman who might still have childbearing ability was an appealing prospect. The parties agreed that a total of $70,000.00 would be paid for the marriage. Either party could demand a divorce if the arrangement to live together failed.

Defendant was about 57 years of age when he married his new wife in January, 2004. Defendant had divorced his first wife in December, 2003. Defendant had been married for more than 25 years to Michele Chiang; but that 1978 marriage was childless. In March, 2005, he learned that Chen Ying, the woman who had arranged his marriage in China to Xu had been arrested in the United States for immigration fraud. The paper work necessary to bring defendant's new wife and children into the United States, came to a halt.

Defendant, was born in China in 1947 and resided in Taiwan from the age of 2 years. Defendant's father had been a general in the Nationalist Army of Chiang Kai Shek. Defendant came to the United States and worked in Chinese restaurants as a waiter and a dining-room Captain. He worked for Chen Ying who owned a restaurant and told her that he wanted to

remarry and have children.  Chen Ying came up with a woman for him to marry (Ms. Xu); and she (Ms.  Ying) seemed very knowledgeable in arranging marriages.

Following the arrest of Ms. Ying, and the difficulty in having the papers for Ms. Xu's emigration approved, defendant called Ms. Xu in China to secure a Chinese divorce.  His efforts were in vain as Ms. Xu refused to cooperate in providing a Chinese divorce because of the opposition of Ms. Ying's clan in China.

No further payments were made to defendant and his 'new' Chinese wife (Ms. Xu) still remains in China; she has never set foot in the United States.

Defendant admits in full the venal aspects of his arrangement to marry a Chinese national and to bring her children with her to the United States.  Defendant admits to a prior agreement to dissolve the marriage at will. Defendant further admits that he barely knew the woman he had agreed to marry and had engaged in activities with her to simulate an active romance by appearing to cohabit after the marriage ceremony which had been generously photographed and bolstered with a wedding party.  These were devices and artifices that defendant was instructed by the marriage broker (Ying) to engage in order to provide the 'marriage' with the appearance of authenticity.

Near the end of 2003, defendant made a drastic change in his life.  He ended his marriage of 25 years to Michele Chiang; his attractive, but childless wife.  Defendant was euchred into making this change by the woman (Ying) who was in the restaurant business and had dabbled in

setting up sham marriages with women from mainland China. Defendant's motivations were probably several and very mixed. He was approaching 60 years of age and was plodding along in low paying restaurant jobs that held no promise of any wealth or comfort. He had no children and lived with a wife who earned a scant livelihood. Ms. Ying, the marriage planner for whom he had worked in the past, listened to his yearnings for a family; and for children of his own. The cultural imperative of 'family' and 'children' possessed him and the important possibility of cash enrichment took over. He was persuaded to jettison the marriage to his long standing wife, Michele, and to pursue a liaison with Ms. Xu who was only 40 years of age; could likely bear children, and would pay $60,000.00 more for the marriage.

Within one year, defendant traveled to China, met and married Ms. Xu, met her two children, and was paid $10,000.00 to start the marriage off. The balance was to be paid as the new couple became closer. Over time, the woman and her already established family became enticing. If the marriage did not burgeon with love and offspring, the couple had available a mutually agreed upon 'safety valve' divorce. The union of defendant and Ms. Xu was possibly seedy by 'western' standards; but was not unusual or steeped in criminality. The intervening arrest of Ms. Ying, the 'sham' marriage broker, aborted the chance that the marriage could become rooted and successful. Now, it will never be known if the union could have survived.

The marriage was contrived and made to appear as sincere; being accompanied by dubious and half-true representations to the State Department that the couple had lived together; which was arguably an overstatement of the fact. The payment of $10,000.00; with the promise of $60,000.00 more if the couple hardened the relationship, skirted the edges of what average

people might do in a more leniently sighted culture. The arrangement fell outside of the limits of acceptability in our society and was pounced upon by the arrested matchmaker, Ms. Ying, once she was arrested and had decided to make her 'deal' with the Government.

    We do not commend the defendant for making a choice so close to the line. Yet, he is deserving of some consideration at the 'sentence' level. Defendant has no previous criminal record and is now sickly and only employed on a part-time basis. He can do no lifting. He is in need of rest and cannot stand for long periods of time. He resides with his brother in Flushing, Queens. He has no home of his own. Defendant has only recently undergone prostate surgery. He is still incontinent and has to manage wearing a diaper because his capacity to urinate controllably has been affected. He still experiences severe pain and requires analgesics.

    As previously stated, defendant is now 60 years of age. He has recently undergone prostate surgery and is trying to return to work; albeit on a temporary/part time basis. He is incontinent and requires a diaper which he must change every few hours. He has been completely out of work for nearly four months. When he is able to work, he is a food handler and he serves food at the Millennium Hotel on 44th Street near First Avenue. There, he is now a part-time banquet waiter. He can work only a few hours each day and becomes quickly fatigued. The management of the hotel knows of his physical predicament and his weaknesses as a worker; but the management is willing to allow him to work under less than stringent or demanding conditions. He has worked at this hotel from many years; catering to a largely United Nations clientele.

Defendant has been divorced for about four years and lives in Flushing, Queens, with his brother Jack who is disabled owing to a serious stroke which Jack suffered about three years ago. Brother Jack is now 69 years of age and has become unable to take care of himself, and especially his private personal needs. Jack has no immediate relatives and depends entirely upon defendant to attend to many of his personal and toilet needs. Jack cannot get to, or use, the toilet without help from his brother, the defendant. If defendant were to be incarcerated as a result of this case, brother Jack will have to be institutionalized and would become a public charge.

Defendant has no place of his own to live and has live with brother Jack in a single room in Flushing, Queens. The room is in an apartment occupied by two other (unrelated) couples who occupy two of the three rooms. Defendant and his brother Jack are actually the third 'couple' in the three room apartment. Defendant lives with his disabled brother Jack in the room which formerly served as a dining room. Defendant and brother Jack live in a three (3) story walk-up; but Jack is now so disabled and hospitalized that he cannot climb any stairs and the two brothers will have to seek another place having wheel-chair access.

As we prepared to work in these papers, brother Jack went into a state of collapse and is was unable to stand or ambulate owing to the after-affects of his stroke. He was taken to the Flushing Hospital Medical Center in Queens during the week of October 22, 2007, and was being cared for in a small space in the Emergency Room of the hospital. Another bed was being sought for him at the hospital. Jack does not have the strength to stand and his legs continually shake and collapse. He has just been released from the hospital.

Defendant loves his brother Jack dearly and the two brothers came to the United States from Taiwan nearly 40 years ago, and often worked together as banquet waiters in various hotels and restaurants. If Jack is permanently released from the hospital, he will continue to live with defendant, and will have to be cared for by the defendant. The two men are as close to each other as is possible.

Following his surrender, defendant was debriefed of all of the information which was of any value to the authorities. He now stands penniless before the Court and is steeped in remorse for the predicament which he created for himself in pursuing the goal of a family life bolstered by children.

Defendant earnestly seeks a non-custodial sentence.

                                        Respectfully submitted,

                                        LAWRENCE K. FEITELL

Dated: New York, NY
       December 13, 2007